**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
ICEBOX-SCOOPS, Inc.,

        **Plaintiff,**

  - against -

FINANZ ST. HONORÉ, B.V. and
DANA CLASSIC FRAGRANCES, Inc.,

        **Defendants.**
------------------------------------------------------------------x

**07 CV 0544**

<u>**OPINION AND ORDER**</u>

**GERSHON, United States District Judge:**

Plaintiff Icebox-Scoops, Inc. brings this action under the court's diversity jurisdiction against defendants Finanz St. Honoré, B.V. ("Finanz") and Dana Classic Fragrances, Inc. ("Dana") (together "defendants") alleging that Finanz breached a licensing agreement between plaintiff and Finanz, and that both defendants committed various torts. Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons stated below, both defendants' motions are granted in part and denied in part.

## I.    BACKGROUND

The following facts are alleged in the complaint and its incorporated documents and are taken as true for purposes of this motion. Because both defendants have answered, their admissions are noted where pertinent.

Plaintiff Icebox-Scoops, Inc. ("Icebox-Scoops") is a New York corporation with its principal place of business at 2126 East 7th Street in Brooklyn, New York. (Complaint ("Compl.") ¶ 5.) As of April 12, 2008, plaintiff has registered the corporate name "Icebox, Inc." ("Icebox") in Pennsylvania as a "fictitious name" for Icebox-Scoops, Inc. (Sack Decl. Exs. A, B.) The Pennsylvania corporate registration lists the same contact information for both Icebox,

Inc. and Icebox-Scoops, Inc., and is signed by Isaac Gindi, the president of Icebox-Scoops, Inc. (*Id.*)

Among other things, plaintiff sells cosmetics and bath and body products. (Compl. ¶ 5.) At all times relevant to the complaint, Finanz, a Netherlands-based corporation, owned the registered trademark TINKERBELL® under International Class 3, covering, *inter alia*, fragrances, cosmetics, and bath and body products. (Compl. ¶ 6.) Dana, an "affiliate" of Finanz, is a Delaware corporation with a place of business in Mountaintop, Pennsylvania. (Compl. ¶ 7.) Plaintiff alleges that Dana and Finanz are related—even interchangeable—companies and have actual and apparent authority to act for each other. (Compl. ¶ 7.)

In March 2005, Icebox and Finanz executed a licensing agreement ("the Agreement" or "the License"),[1] in which Finanz exclusively licensed the TINKERBELL® trademark[2] to Icebox for two years. The License granted Icebox the exclusive right to use, import, manufacture, distribute, offer for sale, and sell TINKERBELL® products in the licensed territory, which the Agreement defined as worldwide. (Agreement ("Agmt.") ¶ 2.1.) The Agreement included a possible extension at Icebox's election for three more years so long as Icebox had met the minimum sales requirements contained in the Agreement for the preceding year. (Compl. ¶¶ 10-11; Agmt. ¶¶ 2.1, 8.) In recognition of the time required to get new products to market, the Agreement did not require Icebox to make a profit during the first year of the License, but did

---

[1] The Agreement was annexed to and made a part of the complaint.

[2] The Tinkerbell trademark at issue in the present case is different from the recognizable and widely-distributed version of the fairy. According to a letter sent from Alfred R. Cowger, Jr., the managing director of Finanz and Dana, to plaintiff during the lifetime of the Agreement (and attached as an exhibit to the complaint) ("Cowger letter"), Disney owns the copyright to the fairy as drawn by Disney, however that copyright gives Disney the right and protection only to use that figure as drawn by Disney. At the time of Cowger's letter, Disney did not own the Tinkerbell name or figure, and Disney could not protest the creation or use of any Tinkerbell character, so long as it was not a copy of Disney's drawn figure.

require net sales of at least $1,250,000.00 in the second year.[3]  (Agmt. ¶ 8.1.)  The Agreement

required that Icebox pay Finanz a royalty of six percent of net sales.  (Agmt. ¶ 9.1.)  In addition

to the sales, the Agreement required Icebox to submit its first batch production to Finanz for

approval, and to report its gross sales for each three-month period within thirty days of the

period's end.   (Agmt. ¶¶ 4.1, 4.2.)    If Icebox did not meet its obligations under the Agreement

and failed to remedy its violations within sixty days of receiving written notice thereof, Finanz

could terminate the License.  (Agmt. ¶ 7.1.)

　　　　The Agreement contained a choice of law section, providing that "interpretation,

performance, operation, rights and remedies relating to, and the legal effect of this Agreement,

including its termination or cancellation, shall be construed pursuant to and governed by the laws

of the State of Pennsylvania and the United States of America, without reference to conflicts of

laws principles."   (Agmt. ¶ 16.3.)   In addition, the License featured a clause requiring all

alterations, modifications, or waivers to be in writing, and a "merger clause," providing that:

> other than those representations and warranties contained in this
> Agreement, the parties have not relied upon any representation of fact or
> law related to the Products or any other factual or legal matter related to
> or referred to in this Agreement, and that the parties are not bound by
> any representations, rights or obligations not specifically contained in
> this Agreement.

(Agmt. ¶¶ 16.2, 17.2.)

　　　　Dana is not a party to the Agreement, which was signed only by Isaac Gindi for Icebox

and Alfred R. Cowger, Jr. for Finanz.  However, Dana was responsible for administering the

agreement (Compl. ¶ 8), and was designated as the recipient of any notices regarding the License

and of any monies resulting from the distribution of products pursuant to the License.  (Agmt. ¶

---

[3] To meet the minimum sales requirements after the second year, the Agreement required
Icebox to net 105% of the minimum sales requirement for the prior twelve-month period. (Agmt.
¶ 8.1.)

16.7.)  All notices sent to the licensor (Finanz) were to be addressed to Finanz in care of Dana at Dana's Mountaintop, Pennsylvania address.  (*Id.*)

During negotiations before the Agreement was executed Icebox expressed concerns regarding the ownership of the TINKERBELL® trademark.  (Compl. ¶¶ 12-14.)   Icebox again raised its concerns after the Agreement's execution.  (*Id.*)   In response to Icebox's inquiries, defendants represented that (1) Finanz owned the relevant trademark; (2) Finanz had the right to grant the License to Icebox; (3) no litigation or other action was threatened or pending involving the TINKERBELL® trademark; (4) to the best of defendants' knowledge, the trademark did not infringe the rights of any other third party, including Disney and its affiliates; and (5) defendants "would maintain the rights being licensed in good standing and in force."  (Compl. ¶ 12; Agmt. ¶ 17.1.)   Defendants also assured plaintiff during negotiations and after the execution of the Agreement that they would "stand by their trademark rights, and would not allow Disney, or anyone else, to interfere with, or impede Icebox's sales of TINKERBELL® products."  (Compl. ¶ 13.)  Defendants further represented to plaintiff that they would not terminate the Agreement "even if they decided to sell the assets or stock of Finanz."  (Compl. ¶ 17.)

In addition, when, after the execution of the Agreement, plaintiff expressed concerns regarding defendants' ownership and protection of the trademark, defendants responded in a letter signed by "managing director" Cowger on letterhead bearing the names of and contact information of both Finanz and Dana ("Cowger letter").[4]   (Compl. Ex. B.)   The letter characterizes Finanz as an "affiliate" of Dana and references both Finanz's ownership of the mark and Dana's past and future control of litigation over the mark.   (*Id.*)   In the letter,

---

[4] As the plaintiff notes and defendants do not contest, the exact date that the letter was written is not determinable because it was sent only electronically, and the date was programmed to change each time the file is opened to reflect that date instead of the date of the file's creation. Plaintiff attached the letter as an exhibit to the complaint.  It is the same letter referenced in footnote 2.

defendants acknowledge that plaintiff had "received a number of queries from retailers" about the License, specifically about Disney's ownership of the trademark. (*Id.*) Defendants provide a brief background of the TINKERBELL® trademark, which defendants acquired from a corporation Cowger calls Tinkerbell, Inc. (*Id.*) Cowger discusses the history of disputes between Disney and the various owners of the trademark over the "use of 'Tinkerbell' as a brand name around the world," and states that Disney never "negated" the trademark rights of Finanz's predecessor. (*Id.*) Defendants' letter affirms that the most recent litigation over the Tinkerbell trademark was resolved by a settlement agreement in 2002, in which Disney agreed "never again to try to use 'Tinkerbell' as a trademark for any children's product in International Class 3." (*Id.*) The letter confirms that Tinkerbell, Inc., "and now Dana," have trademarked TINKERBELL® in categories other than International Class 3 that were "natural … extensions." (*Id.*)

In the letter's final paragraph, defendants again assure plaintiff of their intentions regarding the trademark. Cowger states:

> As I told you during licensing negotiations, the Dana organization is ready to stand by its trademark rights. Thus, if you learn at any time that Disney or any other organization is … claiming that Disney has superior rights over us or can impede your sale of Tinkerbell goods permitted under our license, please let me know immediately. We sued Disney in 2000 and are perfectly capable and willing to do it again if necessary.

(*Id.*)

Plaintiff alleges that the representations made in the letter, and orally during negotiations prior to the execution of the Agreement, "were made for the specific purpose of inducing [p]laintiff to enter into the Licensing Agreement, and to perform and continue to perform thereunder," (Compl. ¶ 16), and that the representations were false when they were made. (Compl. ¶ 45.) Plaintiff relied on defendants' representations by, among other things, entering

into the Agreement, developing products to be sold pursuant to the Agreement, and offering these products for sale.  (Compl. ¶ 46.)

Defendants admit that in mid to late 2005, they entered into negotiations with Disney. (Compl. ¶ 20; Finanz Ans. ¶ 20; Dana Ans. ¶ 20.)  Plaintiff alleges that these negotiations were "for the purpose of selling to Disney the trademark rights" that were the subject of the Agreement "in contravention of the affirmative representations made" by defendants.  (Compl. ¶ 20.)  Defendants also admit that they reached agreement with Disney in 2006, transferring to Disney their "rights in the trademark TINKERBELL® in International Class 3."  (Finanz Ans. ¶ 64; Dana Ans. ¶ 20.)  Plaintiff alleges that defendants benefitted from plaintiff's "efforts to commercialize the mark" in that plaintiff "added value" to the trademark, "allow[ing] [d]efendants to realize a greater price from their sale of the mark to Disney than they otherwise would have."  (Compl. ¶¶ 59-60.)

On or about October 31, 2005, about seven months after the Agreement was executed, defendants informed plaintiff on letterhead from both defendants that they were terminating the Agreement effective immediately.  (Compl. ¶ 24.)  Defendants' stated reasons for termination included plaintiff's failure to provide samples of products it had sold, plaintiff's failure to adequately distribute products under the License, and plaintiff's failure to provide sales and advertising reports as required by the Agreement.[5]  Plaintiff had not received notice of any alleged breach, despite an express provision in the Agreement requiring sixty days' notice for an opportunity to cure any alleged breaches, and alleges that it had fully complied with its obligations under the Agreement.  (Compl. ¶¶ 26-27.)

---

[5] The termination letter was submitted by Dana as an exhibit to an affidavit submitted with Dana's briefing on the instant motion.

Plaintiff's counsel responded by letter on November 3, 2005, and, having received no response, again on March 13, 2006, stating that the termination was improper and that defendants were acting in bad faith, and demanding that defendants cure their breach. (Compl. ¶¶ 30-32.) Defendants at no time have taken action in response to plaintiff's letters. (Compl. ¶ 33; Finanz. Ans. ¶ 33.)

On February 8, 2007, plaintiff commenced this action, alleging: (1) breach of contract; (2) breach of express warranty; (3) fraud in the inducement and subsequent to the execution of the Agreement; (4) negligent misrepresentation; (5) unjust enrichment; (6) equitable estoppel; and (7) promissory estoppel. Plaintiff appeared to allege all seven claims against both defendants, although plaintiff's memorandum of law in opposition to the instant motion states that the breach of contract and breach of warranty claims are not asserted against Dana "because Dana is not a signatory to the contract." (Pl.'s Mem. of Law 2.) Plaintiff seeks injunctive relief, compensatory damages of not less than $5 million, and $15 million in punitive damages. (Compl. ¶¶ 36, 40, 47, 49, 54, 56, 62.)

Defendants now bring motions for judgment on the pleadings. Dana seeks dismissal of all claims against it, or, in the alternative, dismissal of all claims except for the claim alleging equitable estoppel. Finanz seeks dismissal of the entire complaint based on standing, or in the alternative, dismissal of plaintiff's fraud, negligent misrepresentation, unjust enrichment, and estoppel claims. Finanz also asks the court to strike plaintiff's request for injunctive relief.

## II.     DISCUSSION

### a.  Legal Standard

A motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss pursuant to Rule 12(b).

*LaFaro v. N.Y. Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). The court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 115 (2d Cir. 2008). The court may consider only the "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference." *Leonard v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation and citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009). Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In addition, a party alleging fraud must meet a stricter standard. Such a party must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

**b. Plaintiff is a Party to the Licensing Agreement and Has Standing.**

Defendants argue that dismissal is required because the plaintiff in this case, Icebox-Scoops, is not a party to the Agreement and so does not have standing in this action. In addition, Dana argues that Pennsylvania's Fictitious Corporate Names Act ("the Act") bars plaintiff's suit.

The Agreement refers to the licensee only as Icebox—never as Icebox-Scoops—and all communication related to the Agreement was either addressed to Icebox or sent on Icebox letterhead. Plaintiff signed the Agreement as Icebox. However, plaintiff, whose official corporate name is "Icebox-Scoops," did not register the name "Icebox" in Pennsylvania until

after it commenced this action. Nonetheless, defendants' argument that this necessitates dismissal is meritless.

Dana's assertion that the Pennsylvania Act requires dismissal is unsupported by the text of the Act and the case law construing it. The Act requires that "any entity which either alone or in combination with any other entity conducts business in this Commonwealth under or through any fictitious name shall register the fictitious name…." 54 Pa.C.S.A. § 303(b). Entities that fail to register fictitious names may be subject to a civil penalty of $500, and are barred from bringing an action in Pennsylvania state courts. 54 Pa.C.S.A. §§ 331(a), (b).

Under the Act, the use of an unregistered common or colloquial name to identify a party to a contract does not affect the rights of the parties to that contract absent fraud or misrepresentation. *See* 54 Pa.C.S.A. § 331(a). When a "corporation [does] exist but the individuals refer[] to the corporation by a name which [is] not registered," Pennsylvania courts "find that the rights and liabilities of the parties are the same as if the name was registered." *W.F. Meyers Co., Inc. v. Stoddard*, 526 A.2d 446, 449 (Pa. Super. 1987). "Those who deal with an unregistered party and accept the benefits of business transactions, having full knowledge of the party's true identity notwithstanding the fictitious name, are estopped to deny the party's capacity to sue." *George Stash & Sons v. New Holland Credit Co., LLC*, 905 A.2d 541, 543 (Pa. Super. 2006); *see also Lamb v. Condon*, 276 Pa. 544, 548 (1923) ("the purpose of the [Fictitious Names Act is] not to prevent the maintenance of suits for just claims arising from executed contracts, though there was a failure to register as directed by the statute").

Here, defendants do not suggest that they were confused about the identity of the corporation to whom they were granting a license. Defendants at all times had "full knowledge" of plaintiff's true identity. The licensing agreement specified that Isaac Gindi was the president

of Icebox, and that all communication regarding the Agreement should be sent to him. Mr. Gindi is indeed the president of Icebox-Scoops and of Icebox as well. Defendants never believed that they had licensed the use of the trademark to anyone other than Mr. Gindi and his business. Instead, defendants merely complain of the lack of registration, point to other corporations with similar names, and suggest that this is a sufficient showing to preclude plaintiff's suit. It is not. *See Public Industrials Corp. v. Reading Hardware Co.*, 29 F.2d 975, 975 (3d Cir. 1929) (upholding deed where word "the" was omitted from corporate title because there was no question, nor could there be, "raised as to the identity" of the party).[6]

### c. Plaintiff Can Maintain Fraud Claims Against Both Defendants.

### i. Choice of Law

Defendants argue that, because of the Agreement's choice-of-law provision, Pennsylvania law should control all of plaintiff's claims. However, because plaintiff's allegations sound in tort, they are outside the scope of the choice-of-law clause, which refers only to the contract. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (holding that a provision stating that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts" did not require application of that state's law to a claim for fraudulent misrepresentation.)[7] As the parties agreed at oral argument, New York law is

---

[6] The result would be the same under New York law. "New York law is clear that an immaterial variance in the corporate name on the contract does not defeat the intention of the parties to bind the corporation." *Hellenic Lines Ltd. v. Winkler*, 249 F. Supp. 771, 775 (S.D.N.Y. 1966). This rule is applicable where, as here, "[t]here is nothing in the record to suggest that the parties did not intend to bind [plaintiff] and [one party] does not claim that it was misled by the omission [of part of the other party's corporate name]." *Id.* That a party used a short or colloquial title in the contract or in related correspondence is inconsequential where the short name caused no confusion. *Underpinning & Foundation Constructors, Inc. v. U.S. Fidelity and Guaranty Co.*, 325 F. Supp. 2d 194, 195, 196, 197 (E.D.N.Y. 2004); *Spanierman Gallery, PSP v. Love, R.H.*, 320 F. Supp. 2d 108, 111 (S.D.N.Y. 2004).

[7] Like the choice-of-law provision at issue in *Krock*, the clause here by its terms does not cover all claims related to the contract, but merely claims relating to "interpretation,

appropriate because the parties to the Agreement consented to personal and subject matter jurisdiction in New York for any litigation arising between the parties concerning the Agreement; plaintiff is incorporated in and has its primary place of business in New York; the tort took place in New York; and plaintiff suffered its alleged injury in New York. *See Krock*, 97 F.3d at 645-46 (discussing New York's "interest analysis").

### ii. Plaintiff's Fraud Pleadings Are Sufficiently Particular.

Finanz argues that plaintiff has not pled fraud with sufficient particularity to satisfy the requirements of Rule 9(b). Pursuant to Rule 9(b), "a claim for fraud must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990); *M&T Mortgage Corp. v. Miller*, 323 F. Supp. 2d 405, 412 (E.D.N.Y. 2004). The purposes of Rule 9(b)'s heightened standard are "(1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

Rule 9(b) applies to all common law fraud claims, including claims under state law. *Meisel v. Grunberg*, --- F. Supp. 2d ----, 2009 WL 2777165, at *4 (S.D.N.Y. Aug. 31, 2009). Claims of negligent misrepresentation must also be pled with particularity if based on the same set of facts as intentional fraud claims. *Id.*; *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). A party alleging fraud against multiple defendants must "inform each defendant" in the complaint "of the nature of his alleged participation in the fraud" by, for example, "setting forth separately the acts or omissions complained of by each defendant." *Meisel*, 2009 WL 2777165,

---

performance, operation, rights and remedies relating to, and the legal effect" of the licensing Agreement. In instances where a choice-of-law clause is broader, *e.g.* covering "any controversy arising out of or relating to" a contract, the law of the forum selected in the provision may control a court's consideration of allegations that do not sound in contract. *See Turtur v. Rothschild Registry Int'l*, 26 F.3d 304, 309-10 (2d Cir. 1994).

at *5 (internal quotations and citations omitted). However, scienter allegations "are sufficient if supported by facts giving rise to a 'strong inference' of fraudulent intent." *Ouaknine*, 897 F.2d at 80 (internal citation omitted). Courts are "lenient in allowing scienter issues to withstand [motions to dismiss] based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." *In re DDAVP Direct Purchaser Antitrust Litigation*, --- F.3d. ----, 2009 WL 3320504, at *12 (2d Cir. Oct. 16, 2009).

Here, with regard to plaintiff's fraudulent inducement claims, plaintiff alleges that during negotiations prior to the execution of the Agreement, (1) "both defendants warranted that they would "maintain the rights being licensed in good standing and in force" (Compl. ¶ 12); (2) "[d]efendants … represented that they would stand by their trademark rights and would not allow Disney, or anyone else, to interfere with, or impeded, Icebox's sales of TINKERBELL® products" (Compl. ¶ 13); and (3) both defendants made these representations "at various times…for the specific purpose of inducing [p]laintiff to enter into the Agreement, and to perform and continue to perform thereunder." (Compl. ¶ 16.) Plaintiff's complaint alleges that Cowger was the speaker of the misrepresentations, and, as plaintiff stated at oral argument, "others" may have taken part in negotiations as well. And while plaintiff does not identify the exact dates of the alleged misrepresentations, the provided timeframe is narrow. Any other information defendants require for their defense is properly obtainable during discovery.

Regarding plaintiff's post-execution fraud claim, plaintiff alleges scienter as above (Compl. ¶ 16), and alleges that both defendants represented in the May 2005 Cowger letter that, *inter alia*, all litigation with Disney had been settled, that Disney was barred from asserting any claims to the trademark in International Class 3 in the future, and that both defendants "would enforce their trademark rights and defend any future claims against the trademark." (Compl. ¶

14.)  These claims allege misrepresentations separate from the Agreement.  Plaintiff's complaint, together with the appended Agreement and Cowger letter, satisfies the goals of Rule 9(b).  Most centrally, plaintiff's pleadings gave defendants ample notice that the fraud charges were made against both defendants and that both defendants should prepare a defense against them.  The letter is on letterhead bearing both defendants' names, is signed by Alfred R. Cowger, Jr., as Managing Director, states that the "Dana organization is ready to stand by its trademark rights," and references Finanz in the header at the top of the second page.  Given that plaintiff alleges identical fraud claims against both defendants, and alleges that defendants acted as one (Compl. ¶ 9), it was not necessary for plaintiff to provide any further detail regarding which defendant is alleged to have acted or spoken.

Plaintiff's scienter pleading in paragraphs 16 and 45 of the complaint is sufficient.  Though plaintiff's allegations are conclusory, the complaint provides the required "minimal factual basis that gives rise to a strong inference of fraudulent intent."  *M&T Mortgage*, 323 F. Supp. 2d at 412.  Plaintiff has alleged that defendants had a motive to commit fraud (the money they would make by selling their trademark to Disney), the opportunity to commit fraud (negotiations with Disney culminating in the sale of the mark), and facts supporting the "strong inference" (defendants' termination of the Agreement without the contractually-required notice and on what plaintiff alleges is a pretext).  *Id.*  This showing is adequate to satisfy plaintiff's pleading burden.

### iii.   Under New York Law, the Merger Clause Does Not Preclude Plaintiff's Fraudulent Inducement Claim.

As an initial matter, Dana's argument that, because it was not a signatory to the Agreement, *all* of plaintiff's claims related to the Agreement must be dismissed, is meritless. Plaintiff does not assert breach of contract claims against Dana.  However, Dana is subject to

plaintiff's fraud allegations, since, as discussed below, these claims are separate and apart from the contract.

Finanz's argument that the merger clause bars Icebox's fraudulent inducement claim—which would require proof by parol evidence—is also without merit. New York law permits claims "for fraud in the inducement when the misrepresentation is collateral to the contract it induced." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). Moreover, under New York law merger clauses generally do not bar claims for fraudulent inducement unless the clause specifically addresses the very conduct complained of in the fraud allegation. *See, e.g.*, *Dannan Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959); *Fierro v. Gallucci*, No. 06-CV-5189, 2008 WL 2039545, at *13-*14 (E.D.N.Y. May 12, 2008). When a "contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (citing New York cases). In such cases, "the disclaimer [must be] sufficiently specific to match the alleged fraud." *Id.* at 317.

Similarly, since proof of fraudulent inducement usually depends on parol evidence, New York law is clear that "a general merger clause is ineffective … to preclude parol evidence that a party was induced to enter the contract by means of fraud." *Id.* at 315; *see also Hobart v. Schuler*, 55 N.Y.2d 715, 716 (1982) ("a merger clause is generally insufficient to bar parol evidence of a fraudulent misrepresentation"). Instead, a merger clause must address "the very matter as to which [the party] now claims it was defrauded" in order to bar introduction of parol evidence to prove the alleged fraud. *Dannan*, 5 N.Y.2d at 320-21.

Here, the merger clause contained in paragraphs 16.12 and 17.2 of the Agreement is general and does not contain reference to any specific representations. While it does state that there are "no representations, undertakings, or agreements of any kind between the parties hereto respecting the subject matter hereof except those contained in this Agreement," this text is different from the specific clauses that have been found to preclude admission of parol evidence. For example, in *Dannan*, the leading New York case on the subject, the New York Court of Appeals rejected a claim for fraudulent inducement where the merger clause contained a statement that the seller (there, the defendant) had "not made and does not make any representations as to the physical condition, rents, leases, expenses, operation, or any other matter or thing affecting or related to the aforesaid premises, except as herein specifically set forth, and the Purchaser hereby expressly acknowledges that no such representations have been made…." *Dannan*, 5 N.Y.2d at 320. In this case, neither the merger clause nor any other provision of the contract refers to the actions underlying plaintiff's fraud claim with the specificity required to bar a fraudulent inducement claim under New York law.

### iv.     New York Law Does Not Bar Plaintiff's Post-Execution Fraud Claim.

Finanz argues that plaintiff's post-contract fraud claim is barred by Pennsylvania's gist of the action doctrine, which, in essence, "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Erie Ins. Exch. v. Abbott Furnace Co.*, 972 A.2d 1232, 1238 (Pa. Super. 2009). New York law, which applies here, contains a similar doctrine, under which "a tort cause of action generally does not lie where it is duplicative of a claim sounding in contract. However, an actionable tort may exist when the plaintiff asserts that the defendant breached a duty independent of the contract." *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Trust*, No. 1:06-cv-871, 2007 WL 951565, at *2 (N.D.N.Y. March 27, 2007) (internal

citations omitted). While this duty "can be considered independent of the contract even if it arises out of the relationship that the contract created," it must "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Id.* (internal quotation and citation omitted); *see also CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07-cv-11078, 2009 WL 2033048, at *8 (S.D.N.Y. July 13, 2009). In such cases, "it is well established that fraud-based claims may exist alongside a claim for breach of contract." *Hughes v. BCI Intern. Holdings, Inc.*, 452 F. Supp. 2d 290, 315 (S.D.N.Y. 2006).

In this case, plaintiff alleges that defendants committed fraud by misrepresenting their willingness to protect and maintain the mark in the Cowger letter, thereby inducing plaintiff to revive the TINKERBELL® mark so that defendants could sell the mark to Disney for a substantial profit. This claim is not intertwined with plaintiff's breach of contract claims, and is not subject to the terms of the contract, as it is based on assurances that were not part of the contract between Finanz and plaintiff. *Gotham Boxing, Inc. v. Finkel*, 856 N.Y.S.2d 498 (Table), 2008 WL 104155, at *11 (N.Y. Sup. Ct. Jan. 8, 2008). Nor is plaintiff's fraud claim merely a "general allegation … that defendant entered into a contract while lacking the intent to perform it." *Wall*, 271 F.3d at 416 (internal quotation and citation omitted). Instead, plaintiff alleges that defendants made specific representations after the execution of the Agreement regarding issues on which the Agreement is silent, and that plaintiff relied on those representations by continuing to design and produce items bearing the trademark, even though it is undisputed that plaintiff had no obligation to comply with the Agreement. *Id.* at 417. The Agreement warrants that "licensor will maintain the rights licensed here in good standing and in force, to the extent possible." This guarantee is distinct from defendants' promise in the Cowger letter that the Dana organization

would "stand by its trademark rights." Thus, plaintiff has "sufficiently [pled] a duty beyond the scope of [the] contract," *Consol. Risk Servs., Inc.*, 2007 WL 951565, at *2, and its post-execution fraud claim will not be dismissed.

### d. Plaintiff's Negligent Misrepresentation Claim is Dismissed.

Defendant Finanz argues that plaintiff's negligent misrepresentation claim is barred by Pennsylvania's "Economic Loss" doctrine, which "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). While the doctrine originated in cases concerning products liability, it has "equal application in negligence cases." *Id.* at 619. New York law contains a similar rule. "[U]nder New York's economic loss rule, a plaintiff asserting a claim of negligent misrepresentation who has not suffered any personal or property damage is limited to an action in contract." *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009). That plaintiff "bases its negligent misrepresentation claim on duties independent of any contract … is inapposite. That the duty breached here is independent of any contract between the parties merely prevents this claim from being dismissed as duplicative of [plaintiff's] breach of contract claims." *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007).

In this case, plaintiff alleges that defendants negligently misrepresented their willingness to comply with the Agreement both prior and subsequent to the Agreement's execution, and that plaintiff relied on these representations to its detriment. Essentially, the negligent misrepresentation claim is a restatement of the fraud claims. However, while plaintiff "has properly pled all of the elements required to state a cause of action for negligent misrepresentation, it has pled purely economic damages as a result of its reliance, thereby

inviting application of New York's 'economic loss rule.'" *Id.* Thus, unlike the fraud claims, which are not subject to this rule, the negligent misrepresentation claim is barred and must be dismissed. *Id.*

### e. Defendant's Motion to Dismiss Plaintiff's Unjust Enrichment and Equitable Estoppel Claims is Granted, but Plaintiff's Promissory Estoppel Claim Survives.

Plaintiff alleges three equitable claims against both defendants: unjust enrichment, equitable estoppel, and promissory estoppel. Finanz urges that all of plaintiff's equitable claims be dismissed because such claims are barred by the existence of a contract between the parties. Dana argues that plaintiff's unjust enrichment claim should be dismissed because it is a dressing up of a claim for tortious interference, and plaintiff has not properly pled that claim. Because plaintiff's equitable claims, like its fraud claims, are outside the scope of the Agreement's choice-of-law provision, New York law applies.

### i. Unjust Enrichment

As a preliminary matter, Dana's assertion that plaintiff's unjust enrichment claim is really a claim for tortious interference is totally unsupported and stated in only conclusory terms. The court therefore will evaluate plaintiff's claim as alleged.

Finanz argues that plaintiff's unjust enrichment claim must be dismissed because "plaintiff's quasi-contract claims may not be maintained in the face of an express contract on the same subject matter." Plaintiff responds that it does not seek damages arising from the Agreement through its unjust enrichment claim. Instead, plaintiff argues that its efforts added value to the TINKERBELL® trademark, allowing defendants to "realize a greater price from their sale of the mark to Disney than they otherwise would have." (Pl.'s Opp. at 21.)

"Under New York law, an enforceable contract between the parties concerning a particular subject matter precludes quasi-contractual recovery in unjust enrichment for claims

arising out of that subject matter." *Consol. Risk Servs.*, 2007 WL 951565, at *7. This is true "even if one of the parties to the lawsuit is not a party to the contract." *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I,* LLC --- F. Supp. 2d ----, 2009 WL 2191318, at *9 (S.D.N.Y. July 23, 2009) (internal quotation and citation omitted). However, New York permits the alternative pleading of breach of contract and unjust enrichment claims—and the survival of both claims at the motion to dismiss stage—"where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *IIG Capital LLC v. Archipelago, L.L.C.*, 36 A.D.3d 401, 405 (1st Dep't 2007).

Here, neither party disputes the existence of the Agreement. Plaintiff argues that its unjust enrichment claim is based on the value plaintiff added to the mark by virtue of its efforts to produce and sell items bearing the TINKERBELL® name and that this claim is "wholly distinct" from the Agreement. However, in reference to the unjust enrichment claim, plaintiff itself states that it acted "in reliance upon the terms and conditions of the Licensing Agreement." (Compl. ¶ 58.) Therefore, there is no "bona fide disagreement regarding the applicability of the contract to the unjust enrichment claim," *Cohen v. LTF Real Estate Co., Inc.*, No. 08-cv-4591, 2009 WL 1373542, at *5 (E.D.N.Y. May 15, 2009), and the claim is barred.

### ii. Equitable Estoppel

Plaintiff claims that defendants should be estopped from selling or licensing the TINKERBELL® trademark to Disney because defendants specifically represented to plaintiff that plaintiff would be the exclusive licensee of the trademark for the life of the contract. Plaintiff's claim is not cognizable under New York law.

New York permits the application of equitable estoppel only in exceptional circumstances where estoppel is not duplicative of a breach of contract claim, *Guerrero v. West*

*23rd St. Realty, LLC,* 45 A.D.3d 403, 404 (1st Dep't 2007), and where one party seeks to compel another to take action that it was not already required to take by the terms of a contract. *In re 80 Nassau Assoc.*, 169 B.R. 832, 842 (Bkrtcy. S.D.N.Y. 1994). In this claim, plaintiff contends that it relied to its detriment, not on representations prior to or after the signing of the Agreement, but on specific contract terms. Thus, plaintiff's claim is prohibited.

### iii. Promissory Estoppel

Plaintiff alleges that it is entitled to promissory estoppel because, by continuing to perform under the Agreement, when failing to do so would not have resulted in a breach of the Agreement, plaintiff relied to its detriment on statements made by defendants in the Cowger letter. Finanz responds that, because plaintiff was obligated to act under the integrated contractual agreement, it cannot now claim to have reasonably relied on the letter to its detriment.

In New York, promissory estoppel generally applies "only where there is no written contract, or where the parties' written agreement is unenforceable for some reason." *Washington v. Kellwood Co.*, No. 05-cv-10034, 2009 WL 855652, at *9 (S.D.N.Y. March 24, 2009). However, neither "the existence of a written contract" nor "the existence of a merger clause in an agreement" automatically forecloses all promissory estoppel claims. *Id.* Instead, "[w]hile [a merger clause] may preclude [a party] from claiming [it] reasonably relied upon promises *prior* to the [contract], it does not preclude [the party] from claiming [it] reasonably relied upon promises made *after* the [contract]." *Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02-cv-7666, 2004 WL 1886293, at *8 (S.D.N.Y. Aug. 24, 2004).

For the reasons stated *supra* in the discussion of plaintiff's post-execution fraud claim, plaintiff's allegations against both parties are sufficient to survive this motion to the extent that

they are based on the post-Agreement letter. *Kellwood Co.*, 2009 WL 855652, at *9. However, plaintiff cannot seek promissory estoppel to address promises made in the Agreement or in the negotiations prior to its execution.

### f. Injunctive Relief is Not Available to Plaintiff.

Finanz argues that injunctive relief is inappropriate because plaintiff has a remedy at law. Though it was not clear initially for which claim or claims plaintiff seeks injunctive relief, plaintiff stated at oral argument that it sought injunctive relief on its contract claims. Because this relief is not available to remedy a contract-based claim, defendant's request to strike plaintiff's request for injunctive relief is granted.

## III. CONCLUSION

For the foregoing reasons, defendants' motions for judgment on the pleadings are granted in part and denied in part. The motions are granted to the extent that plaintiff's negligent misrepresentation, unjust enrichment, and equitable estoppel claims are dismissed. The motions are denied as to plaintiff's fraud claims and as to its promissory estoppel claim to the extent indicated in this opinion. Plaintiff's request for injunctive relief is stricken.

SO ORDERED.

_____/s/_____

**NINA GERSHON**
**United States District Judge**

**Dated:** November 16, 2009
          Brooklyn, New York