UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ICEBOX-SCOOPS, INC.<br><br>                     Plaintiff,<br><br>   v.<br><br><br>FINANZ ST. HONORE, B.V. and<br>DANA CLASSIC FRAGRANCES, INC.<br><br>                    Defendants. | CIVIL ACTION NO.<br>07-CIV-0544 (NG/SMG)<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Morris E. Cohen (MC-4620)
Lee A. Goldberg (LG-9423)
Benjamin H. Graf (BG-1409)
Limor Wigder (for admission *pro hac vice*)
Goldberg Cohen LLP
1350 Avenue of the Americas, 4th Floor
New York, New York 10019
646-380-2087 (phone - main)
646-380-2084 (phone - direct)
646-514-2123 (fax)
mcohen@goldbergcohen.com
lgoldberg@goldbergcohen.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      SUMMARY JUDGMENT STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     THE UNDISPUTED FACTS DEMONSTRATE THAT FINANZ AND DANA
        COMMITTED FRAUD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        A.     Defendants' False Representations Regarding Trademark Actions.. . . . . . 5
        B.     Defendants' False Representations That It Would Keep the Trademark
               Rights in Force Against Disney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    THE UNDISPUTED FACTS LIKEWISE DEMONSTRATE THAT FINANZ
        WILLFULLY BREACHED THE PARTIES' AGREEMENT. . . . . . . . . . . . . . . . . . . . 15

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**

*Ipcon Collections LLC v. Costco Wholesale Corporation,* 2012 U.S. App. LEXIS 20944 (2nd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lipton v. Nature Company,* 71 F.3d 464 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). . . . . . . . . . . . . . 9, 14

**STATUTES**

15 U.S.C. § 1127 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56©. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**TABLE OF EXHIBITS**

1.    Tinkerbell Trademark Registration Certificates in Class 3

2.    Settlement Agreement in New Dana and Finanz v. Disney

3.    Opposition filed by Finanz against Disney before the TTAB

4.    Disney's Answer and Counterclaims before the TTAB

5.    Email of Nov. 22, 2004 from Al Cowger to Morris Cohen

6.    Alfred Cowger email dated February 18, 2005

7.    Finanz-Icebox Licensing Agreement dated March 2005

8.    Order and Decision dated April 28, 2005 issued by the U.S. Patent and Trademark Office ("USPTO") Trademark Trial and Appeal Board ("TTAB") in trademark actions Disney v. Finanz and Finanz v. Disney

9.    Alfred Cowger Letter of May 5, 2005

10.   Catalog of Tinkerbell Products Designed and Developed by Icebox

11.   Transcript of Alfred Cowger July 5, 2005 deposition (excerpts)

12.   Transcript of Isaac Gindi's August 17, 2005 deposition (excerpts), and Exhibit 99 from deposition (photograph of Icebox TINKERBELL® lip gloss wand)

13.   Article in USA Today entitled "Disney hopes fairies will fly into girls' hearts" posted Aug. 25, 2005 (updated Aug. 26, 2005)

14.   Disney Fairies website (with copyright notice of August 2005)

15.   Letter dated August 26, 2005 from Alfred Cowger to Disney

16.   Email of Alfred Cowger to Icebox dated September 16, 2005 at 10:59 am

17.   Email of Alfred Cowger to Icebox dated September 16, 2005 at 2:05 pm

18.   Finanz-Disney draft Letter of Intent Agreement dated September 22, 2005

ii

19.    Executed Finanz-Disney Letter of Intent Agreement dated October 11, 2005 (including both a legible copy, and the faxed executed copy)

20.    Finanz First Notice Letter to Icebox of Termination of Agreement, dated October 17, 2005

21.    Email from Morris Cohen to Alfred Cowger, and responsive email from Alfred Cowger to Morris Cohen, both dated October 20, 2005

22.    Email of October 26, 2005 from Disney to Alfred Cowger

23.    Finanz Second Notice Letter to Icebox of Termination of Agreement, dated October 31, 2005

24.    Letter of Morris Cohen to Alfred Cowger dated Nov. 3, 2005

25.    Order of Dismissal of the TTAB Proceedings dated April 12, 2006 (pursuant to Finanz and Disney's Stipulation of March 7, 2006)

26.    Icebox interrogatory responses dated December 12, 2007 (excerpt)

27.    Transcript of Alfred Cowger June 12, 2012 deposition (excerpts)

28.    Transcript of Isaac Gindi August 30, 2012 deposition (excerpts)

29.    Transcript of Morris Cohen September 11, 2012 deposition (excerpts)

30.    Icebox Response of Aug. 9, 2012 to Defendants' Third Set of Interrogatories (excerpt)

## INTRODUCTION

Plaintiff Icebox-Scoops, Inc. ("Icebox") hereby moves for summary judgment on its fraud and breach of contract claims in this matter.  Based on the undisputed facts, it is respectfully submitted that Icebox is entitled to judgment on all of those causes of action as a matter of law.

## SUMMARY OF FACTS

The present case concerns the well-known trademark TINKERBELL® in International Trademark Class 3[1] ("TINKERBELL®").  Exhibit 1.  Originally, Defendant Finanz – not Disney – was the owner of rights to that trademark.  Exhibit 9.  However, it was important to Finanz to find a licensee to commercialize TINKERBELL® goods to protect those rights, especially from Disney.  Exhibit 16.  Without commercialization, trademark rights go abandoned as a matter of law.  *See*, 15 U.S.C. § 1127 (2006) (extended non-use of a trademark results in its abandonment).

As a result, Defendants[2] entered negotiations with Icebox regarding a potential license granting Icebox the right to commercialize goods under the mark.  During the negotiations, Defendants made repeated material representations to Plaintiff regarding their ownership of the mark and their intentions with respect to that mark to induce Icebox to enter into a licensing agreement.  Exhibit 9 (p.2 last paragraph).

Importantly, firm assurances were provided by Defendants on multiple occasions that there were no pending or threatened actions regarding the trademark, and that all litigation

---

[1]  International Trademark Class 3 is the class of goods including fragrances, cosmetics, bath and body products (including, skin products and so forth), health and beauty aids, and related products.

[2]  Defendant Finanz, a holding company that owned the trademark rights, is an affiliate of Defendant Dana Classic Fragrances, Inc.  ("DCF").  Both are part of a group of companies which they call "the Dana organization."  *See*, Exhibit 9 (p.1 letterhead and p.2 final paragraph).

between Defendants and Disney concerning the mark had been settled.  *See e.g.*, Exhibit 7 ¶ 17.1, and Exhibit 9.  Defendants likewise represented that they would stand behind and defend the mark and the rights being granted against Disney and any other party, and that, if the parties executed an agreement, Defendants would not terminate the agreement to sell the trademark rights to anyone else, including Disney, even upon a sale of the company.  Exhibits 6, 9, and 28 at 197:3-198:5.

Express representations to that effect were given to Icebox's president Isaac Gindi and to its Icebox's outside counsel by Alfred Cowger, in his capacity as an officer of both Defendant corporations.[3]  Exhibit 9.

Those representations were all false.  For example, Icebox later learned that Defendants had ongoing litigation with Disney over the TINKERBELL trademark in Class 3 before the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and Trademark Office.  Exhibits 3 and 4.  In that litigation, Disney was suing for invalidation of the marks on the grounds of Finanz's abandonment by non-commercialization thereof.  Exhibit 4.

Simply stated, Defendants' representations were made to induce Plaintiff to enter into the Licensing Agreement to lead Icebox to believe that it could license the TINKERBELL® mark in Class 3 with no concern regarding Disney.

In reliance upon Defendants' representations, Icebox entered into a License Agreement with Finanz on March 1, 2005.  Exhibit 7.  After execution, the misrepresentations were repeatedly made again by Defendants, to induce Plaintiff to accelerate its commercialization

---

[3]  *See e.g.*, Exhibit 9 (letter later confirming those representations, on letterhead indicating that it came from both Dana and Finanz, indicating that both companies would stand behind the marks licensed in the Licensing Agreement).

activities well beyond the obligations required by the Agreement and to engage in sales as soon as possible.  Exhibit 9.  In particular, under the Licensing Agreement, Icebox had no obligation to make any sales – at all – in the first year.  Exhibit 7 ¶ 8.1.  The parties all recognized from the outset that designing and developing a new TINKERBELL® product line would take considerable time and effort.  However, in May 2005 Defendants needed Icebox to move faster than set forth in the Agreement due to their escalating ongoing dispute with Disney in Class 3 (which they were concealing from Icebox).  Exhibit 8.

Icebox, in turn, engaged in extensive efforts to design, develop, and offer for sale goods under the mark.  As part of those efforts, Icebox designed and developed an entirely new line of TINKERBELL® products, including products falling under Icebox's proprietary patents.  Exhibit 10.

Icebox was then subpoenaed by Disney in connection with Disney's ongoing efforts to challenge the marks on the grounds of abandonment.  This marked the first time that Icebox became aware of the pending action between Finanz and Disney in the TTAB.  In response to the subpoena, Icebox provided documentation and deposition testimony confirming its design, development, and commercialization efforts.  Exhibits 10 and 12.  Thereby, Icebox's documents and testimony demonstrated that abandonment was not a viable challenge to the Class 3 TINKERBELL® mark, due to Icebox's efforts.

After the deposition, Disney and the Dana organization immediately entered into negotiations regarding a sale to Disney of Finanz's TINKERBELL® marks (*see,* Exhibit 15)  – directly contrary to Defendants' repeated prior representations that it would keep those marks in force against Disney, and defend them against Disney.  Newly strengthened by Icebox's

3

commercialization efforts, Finanz used those efforts to improve Finanz's potential gains from a Disney purchase.  Within a matter of only a few weeks, the Dana organization and Disney had agreed to the parameters of a TINKERBELL® sale – a sale that was to specifically include a transfer by Finanz to Disney of the very trademark rights that had been granted to Icebox and that Icebox still held.  Exhibits 18 (draft) and 19 (executed).

Specifically, Icebox had the exclusive rights to commercialize goods under the marks, which included the sole right to manufacture, offer for sale, and sell goods under the TINKERBELL® mark for up to five years.  Exhibit 7 ¶¶ 2.1 (Grant) and 6 (Duration).  Disney desired those commercialization rights right away since it had immediate business plans to launch a lucrative TINKERBELL® and "Disney Fairies" line of products intended to mimic the success of its prior "Disney Princesses" line.  *See e.g.,* Exhibits 13 and 14.  Without Icebox's rights, Disney could not commercialize any products under the mark, minimizing the value of Finanz's rights to it.  Exhibit 7, ¶ 2.1 (exclusivity).  Accordingly, Finanz agreed to sell and Disney agreed to buy the rights held by Icebox under its Agreement.  *See,* Exhibit 19.   This was all without obtaining Icebox's consent.

Finanz then summarily terminated Icebox's rights in the Agreement a mere eight months after the Agreement was executed, to sell those rights to Disney and to avoid having to compensate Icebox for the contractual trademark rights that Icebox lawfully held under the parties' Licensing Agreement.  *See,* Exhibits 20 and 23.  As grounds for terminating Icebox's license, Finanz claimed Icebox had "breached" their agreement by selling goods "without approval."  Exhibit 23.  Finanz then consummated its lucrative sale to Disney of all of the rights Finanz had owned – including the rights Icebox had been granted and held on an exclusive basis.

4

**ARGUMENT**

**I.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when there are no genuine issues of material fact related to the motion and the movant is entitled to judgment as a matter of law.  *See,* Fed. R. Civ. P. 56©; *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005).

**II.    THE UNDISPUTED FACTS DEMONSTRATE THAT FINANZ AND DANA COMMITTED FRAUD**

*A.    Defendants' False Representations Regarding Trademark Actions*

In the License Agreement, Finanz exclusively granted all commercialization rights in its Class 3 TINKERBELL® marks to Icebox.  *See*, Exhibit 7 at  ¶ 2.1 - 2.2 and C.1 (the "Licensed Trademarks").  In the United States, those "Licensed Trademarks" included U.S. Trademark Registration Nos. 671,944; 669,730; 1,235,582; and 1,262,149; all for the mark TINKERBELL® in Class 3.  *See*, Exhibit 7 at p. 25; *see also*, Exhibit 1 (trademark registration certificates in Class 3).  During negotiation and execution of the License Agreement, Defendants represented that there were ***no pending or threatened actions*** involving those Licensed Trademarks.  *See e.g.*, Exhibit 7 at §17.1(b).  They orally made those representations during negotiations to induce Icebox to enter into the license, and later included those representations in writing in the executed Agreement.  *Id.*

Those representations were deliberately false.  At the time, Finanz had ongoing trademark actions with Disney regarding all of those Licensed Trademarks.

On December 24, 2003, Finanz filed a trademark opposition against Disney before the

U.S. Trademark Trial and Appeal Board (the "TTAB") of the U.S. Patent and Trademark Office ("the USPTO"), on the grounds that Disney's application for the mark TINK in Class 3 violated Finanz's rights.  *See,* Exhibit 3.  In its opposition, Finanz asserted, *inter alia,* its Class 3 U.S. Trademark Registrations 1,262,149; 1,235,582; 669,730; and 671,944 cited above.  *See*, Exhibit 3 at ¶¶ 5-8.

In response, Disney counterclaimed that those Finanz TINKERBELL® marks in Class 3 had all been ***abandoned*** due to nonuse and acts of omission by Finanz, and was suing for cancellation thereof.  *See,* Exhibit 4 at 12-17.  As of March 1, 2005, this action was still pending and was being actively litigated.[4]  *See e.g.,* Exhibit 8 (order entered April 28, 2005 in the proceedings).

Thus, when the License Agreement was negotiated in 2004-2005, and when it was executed in March 2005, there ***was*** an ongoing pending action regarding the Licensed Trademarks – a pending action with Disney no less, in which Disney was suing for cancellation of all of the Licensed Trademarks on the grounds of abandonment.  Finanz was well aware of this action, as it was actively participating in it.  *Id.*  Yet, it falsely represented to Icebox that there were no pending or threatened actions.

After the License Agreement was executed, Finanz made such false representations again to induce Icebox to accelerate its commercialization efforts.[5]  In a letter dated May 5, 2005, Mr.

---

[4]  The action was not dismissed until 2006, upon Finanz's sale of its marks to Disney.  *See*, Exhibit 25 (April 12, 2006 dismissal of the TTAB action per the parties' stipulation filed after the sale).

[5]  As noted above, under the License Agreement no sales by Icebox were required within the first year.  However, the Dana organization needed Icebox to move faster than required under the Licensing Agreement due to the developing litigation before the TTAB (which included the deposition of Al Cowger two months later).

Cowger, on behalf of both Dana and Finanz, continued to represent that any ongoing disputes between Finanz and Disney were in categories other than Class 3. *See,* Exhibit 9. Specifically, Mr. Cowger stated that "Going **beyond** Class 3 ... I will admit that we do have some on-going disputes with Disney ***in these other categories*** because they were not covered by the 2002 settlement agreement." *See,* Exhibit 9 at p.2 (first full paragraph) (emphasis added).

That representation was also knowingly false. As discussed above, there was an ongoing dispute with Disney with respect to the Licensed Trademarks *in Class 3* at that very time. Mr. Cowger was well aware of this. Indeed, the Trademark Trial and Appeal Board had issued an Order in that dispute – only several days before – addressing Disney's request for sanctions for Mr. Cowger's failure to appear at his deposition. *See*, Exhibit 8. Indeed, as Icebox has now learned, that Order set a schedule of deadlines therein for Finanz to provide discovery and testimony regarding commercial use of the Class 3 TINKERBELL® trademarks, including a July 30, 2005 close of discovery deadline. *Id.* at p. 7-8. It is apparent that the issuance of that Order setting Finanz's deadlines to provide discovery of its use prompted Mr. Cowger to press Icebox to accelerate its commercialization efforts. Thus, several days after the April 28, 2005 Order was issued, Defendants' false statements were reaffirmed to Icebox in the May 5, 2005 letter as part of Mr. Cowger's efforts to induce Icebox to expedite its sales to retailers. *See,* Exhibit 9.

During negotiations, Icebox had specifically enquired about the status of Finanz's rights vis-a-vis Disney. Understandably, it did not want to enter into a license to TINKERBELL® and make goods under that mark if Finanz did not have the rights thereto, or if the rights would not be maintained in force. In response, the Dana organization specifically represented on multiple occasions during license negotiations that they had superior rights over Disney. They later

7

confirmed those representations in writing, and confirmed in writing that those representations had been previously made during the licensing negotiations.  *See e.g.,* Exhibit 9 at 2 (last paragraph).  Mr. Cowger, on letterhead on behalf of Dana and Finanz, represented that the Dana organization was ready to stand by its trademark rights, and that Disney does <u>not</u> have superior rights to Finanz.[6]  He also represented that the Dana organization "sued Disney in 2000 and are perfectly capable and willing to do it again if necessary."  *Id.*  He did so to mislead Icebox into thinking that the Dana organization was willing to engage in litigation with Disney <u>in the future</u>, as if there was no ongoing litigation proceeding in the present.

Accordingly, Icebox submits that it is entitled to summary judgment on its fraud claim as a matter of law.  "A party has made out a claim of fraudulent inducement if it has pled (I) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages."  *Ipcon Collections LLC v. Costco Wholesale Corp.*, 2012 U.S. App. LEXIS 20944 (2nd Cir. 2012) (citations omitted).  All of those elements are present here.

(I)  As discussed above, and as the documents indisputably show, there can be no doubt that the Dana organization materially misrepresented during license negotiations that there were no pending actions regarding the Licensed Trademarks.

(ii) There also can be no dispute that the Dana organization intended to deceive Icebox. This was no innocent mistake.  The Dana organization was fully aware of the ongoing battle it had with Disney.  However, it needed Icebox's commercialization efforts to prevent a finding of

---

[6]  Mr. Cowger likewise told Mr. Gindi that Icebox would have a long term contract and that Defendants would not be selling the mark to Disney.  *See e.g.,* Exhibit 28 at 197:3-15.

abandonment of the Licensed Trademarks, *which Disney was seeking at that very moment*. *See,* Exhibit 8 (April 28, 2005 Order from TTAB) and Exhibit 4 (Disney's Answer and Counterclaims). So Mr. Cowger of the Dana organization deliberately made false statements to Icebox that there were no pending actions, knowing full well that those statements were false. *See,* Exhibit 8 (Order referring to the disputes involving Mr. Cowger in that pending action).

(iii) Icebox relied on the Dana organization's statements, and it was reasonable to do so. The Dana organization and Disney had previously litigated over the TINKERBELL® trademarks several years before, which litigation was settled. *See,* Exhibit 2 (copy of prior settlement agreement). It was reasonable for Icebox to rely on the Dana organization's statements that the settlement and dismissal of the prior litigation had resolved the disputes with Disney in Class 3, and that the settlement agreement resolved all issues in Class 3 in the Dana organization's favor. *See e.g.,* Exhibit 2 at ¶ 7.

(iv) Last, but not least, there is no doubt that Icebox, after having engaged in extensive time and resources and efforts to design, develop, and commercialize TINKERBELL® goods, has been damaged. *See e.g.*, Exhibit 30. All the time, money, and resources it expended on its efforts went down the drain, and it was deprived of any opportunity to profit from its good faith efforts.

In addition to the representations before execution of the Agreement, the Dana organization's later statements by Cowger in May 2005 also constitute fraud. *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009).[7] The evidence discussed above

---

[7] "The elements of fraud under New York law are: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or

establishes all the elements of fraud at that time as well.  (1) The Dana organization represented in May 2005 that there were no pending actions involving the Licensed Trademarks in Class 3, which misrepresentation was false and known to be false.  (2) The misrepresentation was made for the purpose of inducing Icebox to rely upon it.  Icebox had encountered skepticism from certain retailers regarding the rights to TINKERBELL, especially vis-à-vis Disney.  *See,* Exhibit 9 ¶1.  The Dana organization wanted and needed Icebox to rely on its representations so that Icebox would increase its efforts to commercialize to those retailers, in view of the recently escalated trademark action before the TTAB, and the Dana organization's now more pressing need to forestall abandonment efforts by Disney.  *See,* Exhibit 8.  Furthermore, the License Agreement did not require any minimum sales of TINKERBELL® products by Icebox in the first year at all.  *See,* Exhibit 7 at ¶ 8.1.  Despite the provisions of the License Agreement, the Dana organization had to induce Icebox to step up its timetable and intensify its efforts to sell to retailers.  This was because of the battle with Disney which was rapidly heating up, including the upcoming discovery schedule in which Finanz would have to provide evidence of commercialization to Disney by July 30, 2005.  *See*, Exhibit 8 at p.7.  (At the time, all of this was concealed from Icebox).  Indeed, Mr. Cowger was deposed by Disney case in connection with abandonment issues just two months later.  *See,* Exhibit 11.  (3) Icebox justifiably relied on the representations.  As discussed above, it was led to believe, and did believe, that all Class 3 issues with Disney had been settled with the settlement of the prior Dana/Finanz-Disney litigation.  *See e.g.,* Exhibit 9.  (4) As also discussed above, Icebox was significantly damaged by the misrepresentations.  *See e.g.,* Exhibit 30.  Indeed, the escalated efforts it engaged in from May

---

material omission, and (4) injury."

10

2005 on could have been put toward its own marks and business. Instead, it diverted efforts from those other projects in favor of the TINKERBELL project. Ex. 28 at 197:21-198:8 and 199:5-10.

Accordingly, it is respectfully submitted that summary judgment should be granted on Icebox's behalf with respect to its fraud claim.

### B.    *Defendants' False Representations That It Would Keep the Trademark Rights in Force Against Disney*

Before and after execution of the license, the Dana organization also misrepresented its commitment to Icebox and to the trademark rights in question. Specifically, Mr. Cowger represented that the Dana organization would stand by its trademark rights; that it would not allow anyone to claim at any time that Disney has superior rights; and that it would not allow Disney to impede Icebox's sales of TINKERBELL® goods as permitted under the license. *See,* Exhibit 9 at p.2 (last paragraph).[8] It assured Icebox that it would not terminate the license even if it sold the whole company. *See e.g.,* Exhibit 6.

All those representations, however, were also false. They were made to induce Icebox to protect the mark from Disney's claims of abandonment and to accelerate Icebox's commercialization efforts, so as to improve the Dana organization's position with respect to Disney. In reliance upon the representations, Icebox engaged in extensive efforts to design, develop, and market TINKERBELL® products to the industry. *See e.g.,* Exhibit 10 (catalog of Icebox TINKERBELL® products. When Disney then learned of Icebox's license, it issued a

---

[8] Those representations were made before the license was executed to induce Icebox to enter into the Licensing Agreement. *See,* Exhibit 9 ("As I told you during licensing negotiations, the Dana organization is ready to stand by its trademark rights ..."). They were also made again in May 2005, after the March 2005 Licensing Agreement was executed to induce Icebox to accelerate its efforts in the face of the escalating issues in the Disney action. *Id.* (Cowger letter of May 5, 2005).

11

subpoena to Icebox in connection with the pending trademark action with the Dana organization, which first brought the pending action to Icebox's attention.  In response to the subpoena, Icebox produced to Disney its confidential documents, including documents regarding the License Agreement and drafts thereof, Cowger's May 5, 2005 letter, Icebox's design and development efforts, its marketing and sales efforts, and so forth.  Then, on August 17, 2005, Disney deposed Icebox over the same.  *See,* Exhibit 12.  At the deposition, Icebox gave testimony confirming and corroborating its commercialization efforts.  *See e.g.*, Exhibit 10 and Exhibit 12 at 74:18-75:7.  As such, Icebox explicitly demonstrated that a position of abandonment by Disney was not viable in view of Icebox's activities.

*__Nine days later__*, the Dana organization and Disney entered into negotiations for a sale of the Dana organization's trademark rights to Disney.  *See*, Exhibit 15.  Within a matter of weeks, the Dana organization and Disney arrived at agreement that a sale would take place, including, all the main terms of the sale.  *See*, Exhibit 18 (Sept. 22, 2005 draft LOI).  Finanz and Disney then executed the final version of that LOI on October 11, 2005.  *See*, Exhibit 19.

This was all contrary to Defendants' false representations that it would keep the trademark rights in force against Disney.

Furthermore, when Finanz and Disney executed the October 11th agreement, the Icebox Agreement was still in force.  It served as an encumbrance upon Finanz's trademark rights, and provided Finanz with certain obligations to Icebox.  Icebox had exclusive rights of commercialization for up to five years in its Agreement.  *See,* Exhibit 7 ¶¶ 2.1 (Grant) and 6 (Duration).   As a result, there was no legal way for Finanz to transfer or for Disney to receive Icebox's commercialization rights without Icebox's consent.

12

Yet, Finanz and Disney agreed that the sale of the marks to Disney was to be "free and clear of any debts, liens, encumbrances, obligations, adverse claims or liabilities of any kind whatsoever." *See,* Exhibits 18 and 19.   Both the initial draft and executed LOI agreement state this. *Id.*  In other words, the Dana organization and Disney had decided that the five year Icebox license was going to simply go away.  That Finanz's rights were being transferred free and clear of the license to Icebox is explicit in the LOI.  The import of that language was also confirmed by Disney's representative at her recent third party deposition in this case.[9]

There can be no doubt of this – indeed the LOI expressly refers to the upcoming termination of the Icebox license. *See,* Exhibit 19 at page 2 ¶ 4 (executed agreement), and Exhibit 18 at page 2 ¶ 4 (initial draft of agreement).

Accordingly, shortly after Disney and Finanz signed the October 11, 2005 agreement, Finanz attempted to terminate Icebox's license on October 17, 2005. *See,* Exhibit 20.  This was the first time that Icebox was ever notified that it was allegedly in breach of the Agreement in any manner.  Icebox responded on October 20, 2005 demonstrating that it was not in breach and Finanz acknowledged the same. *See,* Exhibit 21.

Disney then contacted Al Cowger on October 27, 2005 asking for an update regarding Icebox, as it was "essential" that Dana put the situation with Icebox to rest before the transaction with Disney could be consummated. *See,* Exhibit 22.  Since the first termination letter hadn't been successful (as Icebox was in good standing), Finanz then issued a second, illegal, notice of termination on October 31, 2005.  That second notice "immediately" terminated the License Agreement (*see,* Exhibit 23, p.2 last paragraph), this time based on brand new allegations of

---

[9]  A transcript of that recent deposition has not been received yet.

13

breach which had also never been raised before (*see,* Exhibit 23).

Once  Icebox testified as to Icebox's commercialization efforts (and thereby erected a solid defense against any holding of abandonment), it accomplished what the Dana organization needed, and the Dana organization didn't need Icebox anymore.  So, a few days after the deposition, the Dana organization entered into negotiations and then executed an agreement with Disney that flew in the face of all its earlier representations to Icebox.  Contrary to its representations to Icebox, the Dana organization: (1) ***did not*** stand by its trademark rights; (2) ***did*** provide Disney with superior rights; and (3) ***did*** allow Disney to impede Icebox's sales of TINKERBELL® brand goods, by divesting Icebox of its license rights to sell, and transferring those rights to Disney.

None of these documented facts can be disputed.  As a result, Icebox is entitled to summary judgment on this aspect of its fraud claim as well.  *See, Premium Mortgage,* 583 F.3d at 108 (elements of fraud claim).[10]  The Dana organization's representations that it would maintain the rights being granted in force against Disney were all false.  They were made for the purpose of inducing Icebox to rely upon it – Icebox had expressly stated that it did not want to enter into a license just to have those rights transferred to Disney, and the Dana organization represented it would never do that.  *See e.g.,* Exhibit 28 at 197:7-12.  Icebox also justifiably relied upon those statements.  The Dana organization had just settled a litigation with Disney several years earlier in a settlement confirming that the Dana organization had the rights to Class 3; as a result, Icebox was justified in believing the Dana organization's representations that it had

---

[10]  *See also, Ipcon Collections LLC v. Costco Wholesale Corp.,* 2012 U.S. App. LEXIS 20944 (2d Cir. Oct. 9, 2012) (that the Defendant never intended to honor its contract is a quintessential example of fraud in the inducement).

14

the rights and was committed to maintaining them in force.

Last, but not least, Icebox was certainly injured, as discussed above.  It spent months of time and expense building up a TINKERBELL® brand business which was then precipitously pulled out from under it for the Dana organization's deceitful, self-serving, purposes.  All along, the Dana organization wanted Icebox to improve its legal position, so that Disney could no longer succeed on its abandonment claim and would have to buy out Dana and Finanz's rights.  *See e.g.,* Exhibit 5 (objections by the Dana organization during the licensing negotiations to any provision which would allow Icebox to itself obtain a buyout of the rights during the license).

These documented facts cannot be in dispute.  They demonstrate that the Dana organization deliberately deceived and defrauded Icebox.  Accordingly, summary judgment on Icebox's behalf with respect to this aspect of its fraud claim is proper as well.

## III. THE UNDISPUTED FACTS LIKEWISE DEMONSTRATE THAT FINANZ WILLFULLY BREACHED THE PARTIES' AGREEMENT

There can likewise be no doubt that Finanz's termination of the License Agreement was in breach of the Agreement's terms.  The facts unequivocally demonstrate that Finanz fabricated false pretexts so as to summarily terminate Icebox's rights and proceed with the Disney deal.

Once Icebox had designed and developed TINKERBELL® products (*see e.g.,* Ex. 10), offered them for sale, and testified regarding the same for Disney, Finanz was placed in the very stance it had always sought.  Namely, it was tremendously strengthened – Disney could no longer cancel Finanz's trademark rights due to abandonment and forcibly take them for Disney's own use.  At that point, Disney was forced to negotiate with Finanz for the rights Disney wanted and needed as part of Disney's plans to launch a multi-million dollar new TINKERBELL® and

"Disney Fairies" franchise.  *See e.g.,* Exhibits 13 and 14.  Finanz entered into negotiations with Disney over those rights immediately after the Icebox deposition (Exhibit 15) – Finanz's earlier promises to Icebox to keep the trademark rights in force against Disney notwithstanding.

As soon as Finanz signed the Letter of Intent Agreement with Disney on October 11, 2005 and the deal was set (*see,* Exhibit 19), Finanz then needed to "remove Icebox from the picture."  So, on October 17, 2005 Finanz forwarded Icebox a notice terminating the Licensing Agreement pursuant to Section 7 thereof.  *See,* Exhibit 20.  Section 7 of the Agreement (Exhibit 7) (Termination Section) provided as follows:

> 7.1    In the event that Licensee breaches any of its obligations hereunder and fails to remedy such breach within sixty days of receiving written notice thereof, or if the breach cannot be remedied, the Licensor by written notice to the Licensee may terminate this Agreement immediately thereafter ..."

The October 17th termination notice alleged that Icebox had breached its obligations under the Agreement by failing to maintain insurance as required under Section 4.7, resulting in termination of the Agreement in sixty days.  ***Notably, <u>no other</u> grounds of alleged breach by Icebox were set forth in the October 17th notice***.

Icebox's counsel Morris Cohen wrote back on October 20, 2005 providing a copy of Icebox's Certificate of Insurance, thereby confirming that Icebox was not in default or breach at all, but rather was in good standing.  *See,* Exhibit 21 (bottom email).  In his October 20th email, Mr. Cohen concluded by writing Mr. Cowger that "If you disagree with my understanding that Ice Box is in good standing under the license, please let me know right away so that I can immediately address any concerns you might have, ***whether with respect to insurance or any other issue***."  *Id.* (top email) (emphasis added).

16

On that same date, Mr. Cowger wrote back acknowledging that the Certificate of Insurance was proper per the Agreement.  In his response of October 20th, Mr. Cowger **did not** dispute that Icebox was in good standing.  *See,* Exhibit 21 (top email)  **Nor did he raise any other issues of alleged breach**.  *Id.* (top email)

A week later, on October 27, 2005, Disney wrote to Mr. Cowger asking for an update on progress with Icebox – "**as it is essential that Dana put this situation to rest before the transaction is consummated**."  *See,* Exhibit 22 (emphasis added).

As a result, shortly after Disney's email, a second termination letter was sent to Icebox on October 31, 2005.  *See,* Exhibit 23.  In that second letter, Alfred Cowger, the Managing Director of Finanz, concocted a series of new pretexts for termination of the Agreement.  This time, though, he led off with two grounds of "breach" allegedly requiring "immediate" termination, with no recourse by Icebox.[11]  *See,* Exhibit 23 at para. 1 and p.2 last paragraph.  Namely, Mr. Cowger claimed that Icebox had failed to comply with Paragraphs 4.1(I) and 4.1(ii) of the License Agreement with respect to its offers for sale of goods to Albertson's several months earlier, alleging that Icebox had not obtained necessary approvals.

Such claims, however, were completely false.

Specifically, with respect to Paragraph 4.1(I), Mr. Cowger alleged in his second termination letter that Icebox did not obtain approval for manufacturing goods.  *See,* Exhibit 23.

_____

[11]  Finanz needed to immediately terminate the agreement to proceed with its Disney deal.  *See,* Exhibits 19 and 22.  Thus, while the other grounds were also pretexts, it could not rely on them to terminate immediately.  Even Finanz recognized that those latter "breaches" in its second termination letter (advertising, sales force, etc.) were subject to a sixty day cure period.  In fact, though, even the first two alleged "breaches" in the letter (approvals and batch production/product runs) were subject to a sixty day cure period (if they had occurred, which they never had).

But it is an indisputable fact that Icebox *did have* approval for manufacturing – from Mr. Cowger himself.  Mr. Cowger admitted as much *under oath* in July 2005 in the deposition that was taken by Disney:

| | |
|---|---|
| Disney: | From 2001 to 2005, whatever months they are, there was no manufacture of Tinkerbell goods? |
| Mr. Cowger: | Correct. |
| Disney: | And there still isn't? |
| Mr. Cowger: | By Dana, correct. |
| Disney: | Or by Mr. Gindi except for the samples that he's trying to sell? |
| Mr. Cowger: | I don't know if he started manufacturing anything.  *I have approved goods for manufacturing.* |
| Disney: | I see.  Do you have documents that he submitted to you for approval of these products, photographs or specifications? |
| Mr. Cowger: | *Yes.* |

*See,* Exhibit 11 at 20:23-21:11 (emphasis added).  In his deposition, Mr. Cowger expressly testified that he had approved Icebox's goods for manufacturing.

With respect to Paragraph 4.1(ii), that paragraph required that Icebox submit its first batch production and/or product run to Finanz for approval or disapproval within 30 days; and it provided that such approval was deemed granted if a response was not received within such 30 days.  *See,* Exhibit 7 ¶ 4.1(ii).  In the second termination letter, Mr. Cowger alleged that Icebox had no such approvals, forcing him to terminate the Agreement.

That, too, was concocted.  When Icebox approached Albertson's and other retailers offering TINKERBELL® goods for sale, it had not yet conducted its first batch production or

product runs.  Rather, Mr. Gindi of Icebox was showing mockups to those retailers.  As Mr.

Cowger had also testified in July 2005, he was fully aware of this too, and had approved it:

> Disney:         Have you seen actual physical goods that Gindi is showing
>                 to customers?
>
> Mr. Cowger:     I have seen the graphics, the mock-ups of the goods,
>                 yes.
>
> Disney:         So the answer is you haven't seen the goods themselves?
>
> Mr. Cowger:     I haven't seen physical representations of them.  ***I approved
>                 them based upon the mockups.***

*See,* Exhibit 11 at 24:23-25:6.

As Mr. Cowger expressly admitted under oath, he knew of Mr. Gindi's sales efforts,

knew they were being conducted based on mockups – not first batch productions or product runs

– and had approved of them.  Indeed, Mr. Cowger's earlier May 5, 2005 letter was sent to Icebox

*because* Icebox was approaching retailers – it was sent to assist Icebox in those efforts, with Mr.

Cowger's full approval, consent, and encouragement.[12]  *See,* Exhibit 9.

Mr. Gindi likewise testified as to this in his deposition of August 17, 2005.  *See e.g.,*

Exhibit 12 at 73:3-11 (testifying that no products had been fully made yet, but, rather, that Icebox

was a little over halfway through the stages of production); *see also,* Exhibit 28 at 216:15-21

---

[12]  It is expected that Defendants may try to rely upon Mr. Cowger's new, contrary, testimony when he was deposed in June 2012 to try to create an issue of material fact.  However, that is self-serving testimony by Mr. Cowger seven years after the fact which contradicts Mr. Cowger's earlier sworn testimony – which earlier testimony was contemporaneous with the actual events.  In fact, Mr. Cowger himself professed under oath in his 2012 deposition that his prior testimony was truthful.  *See,* Exhibit 27 at 326:14-22.  (He did so before confronted with the repeated contradictions between his current 2012 testimony and both the earlier 2005 testimony and 2005 documents).  Accordingly, Mr. Cowger's belated change of story in 2012 cannot create an issue of material fact in view of the admissions under oath in his earlier deposition.  Otherwise, any Defendant could then concoct perjured testimony seven years after the fact, to create alleged factual disputes.

(testifying that Icebox never got up to the batch production/product run stage).

Mr. Cowger was well aware of all this at the time, as he himself was at the deposition. *Id.* at 3.  Moreover, Mr. Gindi showed his latest samples to Mr. Cowger in a meeting on August 16th, the day before the deposition.  *See e.g.,* Exhibit 29 at 209:13-210:22, and 215:8-17.  He also showed them at the deposition on August 17th.  *See,* Exhibit 12, 98:4-9, 98:25-99:23, 123:6 (listing Exhibit 99 - sample of talking light up lip gloss wand); and Exhibit 12 at Exhibit 99 (photograph of the sample shown at the deposition).  When Mr. Cowger saw these articles in August 2005, he was throughly pleased with and approved Icebox's activities.  *See e.g.,* Exhibit 28 at 112:17-23; Exhibit 29 at 177:17-25; 207:14-208:9; 215:8-17.

If Mr. Cowger indeed believed (which, of course, he did not) that Icebox had conducted a first batch production and/or product run with respect to Icebox's products, and if he indeed actually had any objections, he had thirty days under the contract to express his disapproval of those actions.  *See,* Exhibit 7, Paragraph 4.1(ii).  Yet, there is not a single contemporaneous document expressing objections by him until the expedient second termination letter.[13]  *Not a single document* from August 2005 through October 30, 2005 sets forth any objections to Icebox on grounds of "lack of approvals" or failure to submit batch production or product runs.  Not even Mr. Cowger's own first termination letter of October 17th sets forth any such objections. *See,* Exhibit 20.[14]

---

[13]  On the contrary, as discussed above, not only was there no disapproval was expressed at the meeting before the deposition, or at the deposition, he was very pleased with Icebox's activities.  *See also,* Exhibit 17.

[14]  Indeed, having not objected as the contract required, Finanz's approval was deemed granted in thirty days (i.e. as of September 16th), under the terms of the contract.  *See e.g.,* Exhibit 7 ¶ 4.1 (ii). Therefore, on October 31st, there was also no basis for termination under Paragraph 4.1(ii) on

Likewise, Defendants provided absolutely no evidence during discovery that Mr. Gindi ever completed a first batch production and/or product run as of October 31, 2005, or that Mr. Cowger had any evidence of one.  Nor is there any such evidence, since the Agreement was terminated by Finanz before Mr. Gindi got to the batch production/product run stage.[15]

Mr. Cowger was well aware that Mr. Gindi was showing mock-ups, and had not conducted batch productions or product runs yet, as he himself testified.  As a result, it was impossible for Mr. Gindi to have breached Paragraph 4.1 (ii).  Mr. Gindi could not be in breach for failing to obtain approvals for the results of a production stage he had not even reached yet.

Accordingly, Finanz's termination of the License Agreement on the grounds of lack of "approvals" was completely unfounded and in breach of the Agreement.

Indeed, on October 31, 2005, Finanz knew full well that it had approved everything that Icebox did and that Icebox was in good standing.  It basically admitted as much two weeks earlier.  When Icebox's counsel provided proof of insurance on Oct. 20th, and stated that Icebox was in good standing under the Agreement, Mr. Cowger did not disagree.  *See,* Exhibit 21.

At that time, Mr. Cowger was well aware of Icebox's offers for sale, and had been so aware for months, having attended Mr. Gindi's August 17th deposition in which Mr. Gindi testified about those commercial efforts.  *Yet, nothing in the first termination letter dated October 17th (see, Ex. 20) or Mr. Cowger's October 20th response to Mr. Cohen  (see, Ex. 21) mention any breach on grounds of "lack of approvals."*  This is because Finanz simply made up

---

grounds of "lack of approval".

[15] *See e.g.,* Exhibit 12 at 73:3-11 (August 200 5 testimony that no products had been fully made yet, but that Icebox was still in the stages of production); *see also,* Exhibit 28 at 216:15-21 (August 2012 testimony that Icebox never got up to the batch production/product run stage).

those grounds for terminating the agreement a week and a half later.

Termination of the agreement simply had no connection with any lack of approvals.  Mr. Cowger testified under oath to the contrary in the deposition by Disney and was unwavering in his position that he *had* given Icebox approvals.

During Isaac Gindi's deposition of August 17, 2005, when Isaac Gindi (Icebox's President) testified about his commercialization efforts, Mr. Cowger and his counsel, who were sitting in the room, made no objection nor did they otherwise correct the record that 'no approvals' had been given.  Nor have they produced a single document in this case showing any objections  on the ground of lack of approvals at any time in August 2005, or in September 2005, or even in early October 2005.  No objections were made at all until the Disney deal was signed on October 11, 2005 and Icebox had to be eliminated.  *See,* Exhibit 19.

Indeed, even after the Disney LOI was itself signed, Mr. Cowger did not object to Icebox's activities on grounds of 'lack of approvals' in his first termination notice.  It was not until the end of the month – when immediate termination of the Icebox license was "essential" so that the Disney transaction could be "consummated" (*see,* Exhibit 22) – that the Dana organization concocted a "lack of approvals" pretext for immediate termination.  *See,* Exhibit 23.

Similarly, that there was no problem with approvals is further confirmed by all the communications that took place between Mr. Cowger and Icebox (or its counsel) from August 2005 through mid-October 2005 (until execution of the Disney deal).  Defendants expressed complete satisfaction with the actions Mr. Gindi was taking towards widespread use of the TINKERBELL® mark.  Mr. Gindi's sales efforts were appreciated and praised by Defendants. *See e.g.,* Exhibit 17 (Sept. 16, 2005 email from Al Cowger:  "Please send me a copy of the order

22

when you get it, since it will be good for proof of use. ***Congratulations.***") (emphasis added). At the time, Mr. Cowger never raised a single complaint to Icebox that sales were being conducted without approvals. On the contrary, he expressed full satisfaction with Icebox's efforts, indicated full approval of the upcoming sales, and asked Icebox to send him copies of invoices for proof of use. *Id.* He also acknowledged the role of Icebox's efforts in avoiding abandonment claims by Disney. *See,* Exhibit 16. All of the documentation contemporary with the time period of July through mid-October 2005 is consistent with Mr. Cowger's July 2005 testimony that there were approvals by Defendants.[16]

The September 2005 communications manifest a relationship between Finanz and Icebox in which Finanz was very pleased with Icebox's efforts on Finanz's behalf. *See,* Exhibit 17. It wasn't until several weeks later in October 11, 2005 that the tone changed, once Finanz had accomplished its goals and had finalized its deal with Disney. *See,* Exhibit 19. It was the deal with Disney, and only that deal, which was the basis for Defendants' betrayal of their promises to Icebox, once they were able to obtain the lucrative sale to Disney that they had hoped for. It was

---

[16]     The remaining new grounds of "breach" set forth in the October 31st letter were equally concocted, and also brought up on that date for the first time. They dealt with issues such as lack of sales force, lack of advertising, etc. But as Mr. Cowger well knew, as of October 31, 2005, there was no requirement for ***any*** sales by Icebox. Icebox simply had ***no*** sales requirement at all within the Agreement's first year. *See,* Exhibit 7 ¶ 8.1. When the Agreement was executed, both parties recognized that, in the ordinary course of business, it would take at least a year for Icebox to design and develop a new line of TINKERBELL® products and then commercialize them to retailers. *See,* Exhibit 7 ¶ 8.1. As a result, no sales or minimums would be due until the *second year*, March 2006 - February 2007. *See,* Exhibit 7 ¶ 8.1. There could be no breach in not having a sales force, advertising, or so forth, to sell products in October 2005 in a contract that didn't even require sales of products until the next year. Furthermore, as Finanz well knew, Icebox did have a sales force lined up. *See e.g.*, Exhibit 26 (excerpt from Icebox's interrogatory response with details as to its sales force). Moreover, even Finanz did not deny that those latter grounds in its termination letter were subject to a sixty day cure period.

that deal which was the basis for the termination of the Icebox agreement – not any alleged "breaches" by Icebox.

In any event, even if the Dana organization thought that there were "breaches" (which it didn't really believe for an instant), Mr. Gindi was entitled to notice, including sixty days to cure those grounds of "breach," under the terms expressly set forth in the License Agreement. Failure to provide the sixty day notice was itself another breach by Finanz of the parties' Agreement. Due to Finanz's exigency of moving forward with the Disney deal, Icebox wasn't given a week, much less the required sixty days. Immediate termination was necessary to steamroll forward with the Disney deal. Mr. Gindi hadn't manufactured or shipped yet, so it could certainly have cured any alleged "breach" of approvals regarding goods within sixty days. Indeed, the parties had a conference call after the termination letter to discuss the turn of events. In that call, Mr. Gindi informed the Dana organization that if there really was anything that had not been approved that he would be happy to give it to them for approval. Exhibit 29 at 236:22-237:5. The Dana organization was not interested. *Id.* "Approvals" were a non-issue, and were simply set forth as a pretext.

Mr. Cowger testified under oath in 2005 that he had given Icebox approvals for its activities, and there is not a single document to the contrary until it became expedient to terminate Icebox's contract on October 31, 2005. The thicket of lies that the Dana organization created as part of its fraudulent scheme notwithstanding, there is no documentary or contemporary evidence – at all – in support of the Dana organization's position. There can be no doubt that Finanz willfully and wrongfully terminated Icebox's contract, in breach of that contract, for Finanz's own selfish ends.

## CONCLUSION

For the reasons set forth above, it is respectfully submitted that Icebox's motion for summary judgment on its fraud claims and its claim for breach of contract should be granted in all respects.

Dated: November 5, 2012           Respectfully submitted,
      New York, New York

*/s/ Morris E. Cohen*

_____

Morris E. Cohen (MC-4620)
Lee A. Goldberg (LG-9423)
Benjamin H. Graf (BG-1409)
Limor Wigder (for admission *pro hac vice*)
Goldberg Cohen LLP
1350 Avenue of the Americas, 4th Floor
New York, New York 10019
646-380-2087 (phone - main)
646-380-2084 (phone - direct)
646-514-2123 (fax)
mcohen@goldbergcohen.com
lgoldberg@goldbergcohen.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2012, a true and correct copy of the foregoing Plaintiff's Motion for Summary Judgment was served via electronic mail on counsel of record for Defendants at the following address:

Theresa Trzaskoma
Brune & Richard LLP
One Battery Park Plaza
New York, New York 10004
(212) 668-1900
ttrzaskoma@bruneandrichard.com


Dated: November 5, 2012                    By:    */s/ Morris E. Cohen*
                                                   _____
                                                   Morris E. Cohen